# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

JOEY MONTRELL CHANDLER                                    PLAINTIFF

V.                                                    NO. 4:15-CV-102-DMB-DAS

WEXFORD HEALTH, et al.                                   DEFENDANTS

## MEMORANDUM OPINION

Before the Court is the defendants' motion for summary judgment.   Doc. #45.

### I
### Procedural History and Relevant Background

On or about August 11, 2015, Joey Montrell Chandler filed a complaint in this Court against Wexford Health; the Mississippi Department of Corrections ("MDOC"); MDOC officials Marshall Fisher, Christopher Epps, and Jerry Williams; and physicians Juan Santos, Paul Madubuonwu, John Hochburg, Lorenzo Cabe, "Dr. Lehman," "Dr. Brown," and Gloria Perry. Doc. #1 at 1–2, 5–6.   At the time he filed his complaint, Chandler was incarcerated at the Mississippi State Penitentiary in Parchman, Mississippi.   *Id*. at 1.

In his complaint, Chandler alleged the defendants denied him adequate care for several medical conditions, including back pain, foot pain, and a bacterial infection allegedly causing diarrhea and "fecal leakage."   *Id*. at 3–4, 14–16.   On or about March 9, 2016, Chandler filed a motion to amend seeking to add Centurion of Mississippi as a defendant.   Doc. #9.   The motion to amend was granted on April 13, 2016.   Doc. #11.

A *Spears*[1] hearing was held on April 14, 2016.   Doc. #12.   On July 20, 2016, United

---
[1] *See Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

States Magistrate Judge David A. Sanders issued a Report and Recommendation recommending that Chandler's "claims regarding denial of adequate medical treatment should be dismissed for failure to state a claim upon which relief could be granted. In addition, [Chandler's] claim of retaliation against Emmitt Sparkman should be dismissed for failure to exhaust administrative remedies."[2]   Doc. #16 at 10.

Chandler acknowledged receipt of the Report and Recommendation on July 26, 2016. Doc. #18.   On or about July 27, 2016, Chandler filed an untitled document addressed to Judge Sanders stating:

> On July 21, 2016 at about 9:00 am Supt. Earnest Lee allow Lt Nathan Harris to take my walking cane for no reason on penal logical interest. This action was ill will because of my ongoing litigation. Attach is a copy of ARP in which I will give MDOC 14 days to return my medical prescribed can used during SI Joint flares. If MDOC fails to comply I will file motion in the court immediately because other inmates are having to help around.

Doc. #17 at 1.[3]

On or about October 8, 2016, Chandler filed a document titled, "Plaintiff's Supplemental Objections."   Doc. #19.    On or about February 2, 2017, Chandler filed a "Motion for Leave to File an Amended Complaint Objection."   Doc. #20.   Lastly, on or about March 1, 2017, Chandler filed a "2nd Objection Amendment under Rule 15(a)," which in part is a motion to amend.   Doc. #21.

On July 11, 2017, this Court rejected the Report and Recommendation as moot, granted Chandler's motion to amend, and directed him to file "a single amended complaint with the

---

[2]  The Report and Recommendation notes Chandler's allegation "that, shortly after he filed suit, Deputy Commissioner Emmitt Sparkman asked him to dismiss it, but he would not."   Doc. #16 at 5.

[3]  Chandler attached to this filing a document entitled, "Administrative Remedy Request."   *See* Doc. #17 at 2.

amendments allowed by this order."   Doc. #22 at 4.   On or about August 4, 2017, Chandler filed

an amended complaint stating that he "would request the court to add Defendants: Superintendant

Earnest Lee at Parchman State Prison and Medical Director Hendrik Kuiper and to maintain all

initial defendants."   Doc. #24 at 1.   On February 15, 2018, Judge Sanders granted Chandler's

motion to amend but noted that "[a]s the amended complaint neither names any other defendants

nor describes any other claims, the plaintiff must intend for his 'amended complaint' to be a

supplement to his original complaint."   Doc. #26 at 1.   On March 7, 2018, Judge Sanders

ordered that process issue for Wexford Health, Santos, Madubuonwu, Perry, Brown, Cabe,

Hochburg, Lehman, and Kuiper.[4]   Doc. #30.

In his amended complaint, Chandler claims that the defendants failed to provide him with

adequate medical care for (1) sacroiliac ("SI") joint dysfunction, which causes pain in his lower

back, leg, and foot; (2) bone spurs and plantar fasciitis;[5] (3) a recurring infection of his tonsil; (4)

costochondritis,[6] which causes pain in his chest and shoulder; and (5) shoulder pain (which

medical providers suspect is related to costochondritis).   Doc. #24 at 4.   Chandler also claims

that the defendants failed to respond to his letters and grievances regarding his conditions and

ignored medical orders.   *Id.* at 18–19.   Further, Chandler alleges that Lee improperly searched

his belongings and forced him and other unwell inmates to carry a heavy load of around seventy-

five pounds, despite medical orders that Chandler not lift more than ten pounds, *id.* at 14–15; and

---

[4] On or about May 4, 2018, Chandler sought to reissue process to Wexford Health Services and Centurion of Mississippi due to incorrect addresses.   Doc. #41.

[5] Plantar fasciitis is "inflammation of the plantar fascia, most usually noninfectious, and often caused by an overuse mechanism; elicits foot and heel pain."   STEDMAN'S MEDICAL DICTIONARY 322870 (2014).

[6] Costochondritis is "inflammation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate …."   *Id.* at 208810.

that medical personnel laughed at his condition and suggested that they "cut his head off to relieve him of pain and litigation," *id.* at 20–21.

On June 6, 2018, the defendants filed a motion for summary judgment. Doc. #45. On or about June 20, 2018, Chandler responded in opposition, Doc. #52; and eight days later, the defendants replied, Doc. #55.

## II
## Standard of Review

"Summary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (quotation marks omitted). In evaluating a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."

4

*Id*. (quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

### III
### Analysis

Essentially, Chandler claims that the defendants provided him with inadequate medical treatment for several of his ailments which evinced deliberate indifference and that several of his grievances complaining of his improper treatment were rejected. *See* Doc. #24 at 4, 8, 18–19. Specifically, Chandler claims he endured an unsuccessful tonsillectomy, *id*. at 6; a delayed referral to specialists and prison medical staff's refusal to follow specialists' treatment plans, *id*. at 7–10, 13; generalized delays in providing medical treatment, *id*. at 11–12; carrying seventy-five pounds of weight after prison security demanded he pack and move his property despite medical professionals' order that he not lift more than ten pounds, *id*. at 14–17; improper handcuffing and confiscation of his walking cane, *id*. at 17; doctors' joking that they should "cut his head off," *id*. at 21; and the failure to prescribe him the proper medication, *id*. at 23.

### A. No Constitutional Right to Prison Administrative Grievance Procedure

Chandler brings this case under 42 U.S.C. § 1983, which provides a federal cause of action against every person who, under color of state authority, causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws …." To begin, there is no constitutional entitlement to the existence—or adequacy—of prison grievance procedures. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1430-31 (7th Cir. 1996) (any right to inmate grievance procedure is procedural rather than substantive right and thus state's inmate grievance procedures

do not give rise to liberty interest protected by due process clause); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (no constitutional right to participate in grievance procedures); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (same). The Fifth Circuit has held that "a prisoner has a liberty interest only in freedoms from restraint imposing *atypical* and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (alterations and quotation marks omitted). A prisoner "does not have a federally protected liberty interest in having these grievances resolved to his satisfaction." *Id.*

To the extent Chandler challenges the adequacy of the prison grievance process, including the thoroughness of the investigation of his grievances or the lack of official response to them, those allegations will be dismissed for failure to state a claim upon which relief could be granted.

### B. Statute of Limitations

"Because no specified federal statute of limitations exists for § 1983 suits, federal courts borrow the forum state's general or residual personal-injury limitations period, … which in Mississippi is three years." *Edmonds v. Oktibbeha Cty.*, 675 F.3d 911, 916 (5th Cir. 2012) (citing Miss. Code Ann. § 15-1-49). However, "[f]ederal law governs when a cause of action under § 1983 accrues." *Redburn v. City of Victoria*, 898 F.3d 486, 496 (5th Cir. 2018). Under federal law, "[t]he limitations period begins to run when the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quotation marks omitted). In this case, Chandler became aware of the level of his medical care at the time he received it or should have received it.

The Clerk of the Court docketed Chandler's original complaint on August 13, 2015; he signed it on August 11, 2015. Doc. #1 at 6. Under the prison mailbox rule, a prisoner's federal

complaint is deemed filed when he delivers the petition to prison officials for mailing to the district court. *Spotville v. Cain*, 149 F.3d 374, 376–78 (5th Cir. 1998) (relying on *Houston v. Lack*, 487 U.S. 266 (1988), and its progeny). The Court presumes Chandler delivered his complaint to prison officials on the date he signed it—August 11, 2015.[7] Thus, any claims arising before August 11, 2012—three years before Chandler signed his complaint—would fall outside the statute of limitations for a case filed under § 1983.[8] For this reason, Chandler's claims regarding his 2010 treatment for a bone spur in his left foot, as well as his 2011 tonsillectomy and associated after-care, must be dismissed as barred by Mississippi's three-year general statute of limitations.

## C. Exhaustion

Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.*—including its requirement that inmates exhaust their administrative remedies before filing suit—in an effort to address the large number of prisoner complaints filed in federal courts. *Jones v. Bock*, 549 U.S. 199, 202 (2007). The exhaustion requirement is meant to distinguish frivolous claims from colorable ones, as "[p]risoner litigation continues to account for an outsized share of filings

---

[7] "It is generally contrary to the Prison Mailbox Rule to use a later date—such as the date the U.S. Postal Service postmarked the envelope or the date the Court Clerk's Office stamped the envelope 'received'—as an incarcerated *pro se* party's filing date." *Wolff v. California*, 235 F.Supp.3d 1127, 1129 n.1 (C.D. Cal. 2017). As there is no indication when Chandler delivered his complaint to prison officials, the Court will give Chandler the benefit of the doubt and use the earlier date on which he signed the complaint rather than the later date on which it was received by the Clerk of Court after it had been mailed from the prison.

[8] The continuing violation doctrine allows a plaintiff to defeat a statute of limitations defense. Under 42 U.S.C. § 1983, a continuous and ongoing constitutional violation tolls the statute of limitations period since "the staleness concern disappears." *McGregor v. La. State Univ. Bd. of Sup'rs*, 3 F.3d 850, 867 (5th Cir. 1993) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982)). The continuing violation doctrine—which is not raised by Chandler—does not apply in this case. First, Chandler frames his claims in terms of discrete events—the treatment of his tonsils and the treatment of his hip, foot, and back pain, among other ailments. *See* Doc. #24 at 4. Second, because a wide variety of medical professionals—both MDOC personnel and medical providers practicing outside of the prison—treated Chandler over the years, and he has not alleged that the providers, in concert, intentionally deprived him of adequate medical care. Thus, Chandler has not alleged a continuing violation, but a series of individual violations involving different defendants. Moreover, Chandler has not alleged that an MDOC policy exists which caused the alleged denial of medical care, as discussed below.

in federal district courts" and Congress sought to ensure "that the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Id*. at 203 (quotation marks omitted).

The PLRA's exhaustion requirement applies to actions filed under §1983. 42 U.S.C. §1997e(a). The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal [because] proper exhaustion of administrative remedies is necessary." *Id*. at 83–84; *see Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008) (Fifth Circuit takes "a strict approach" to PLRA's exhaustion requirement); *Lane v. Harris Cty. Med. Dep't*, 266 F. App'x 315, 2008 WL 116333, at *1 (5th Cir. 2008) (unpublished table decision) (under PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). "[A] prisoner must … exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85.

Exhaustion is mandatory and non-discretionary. *Gonzalez v. Seal*, 702 F.3d 785, 787 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, … judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The United States Supreme Court has recognized the need for significant consequences where a prisoner deviates from the prison grievance procedural

rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction ….

*Woodford*, 548 U.S. at 95.

MDOC, pursuant to Miss. Code Ann. § 47-5-801, has established a two-step Administrative Remedy Program ("ARP") through which prisoners may seek formal review of their complaints or grievances while incarcerated. *Threadgill v. Moore*, No. 3:10-cv-378, 2011 WL 4388832, at *3 & n.6 (S.D. Miss. July 25, 2011). Under the ARP, an inmate must make a "request to the [ARP] in writing within a 30 day period after an incident has occurred." *Inmate Handbook*, Miss. Dep't of Corrs. (June 2016), at ch. VIII(IV)(A).[9] The request is then screened to ensure it meets certain criteria. *Id*. at ch. VIII(V). If the request meets the specified criteria, it will be accepted into the ARP and proceeds to the first step. *Id*.

At the ARP's first step, a prison official responds to the request using a Form ARP-2. *Id*. at ch. IV. On this form, inmates can indicate whether they are dissatisfied with the outcome of the first step by "giv[ing] a reason for their dissatisfaction with the previous response." *Id*. An inmate who timely indicates that he is dissatisfied with the first step of the ARP process proceeds to the second step. *Id*. In the second step, like the first step, a prison official responds to the ARP request. *Id*. If the inmate remains unsatisfied with the result, he may then file a lawsuit.

---

[9] Available at: http://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf. The Court takes judicial notice of MDOC's Inmate Handbook. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see, e.g., Smith v. Polk Cty.*, No. 805-cv-884-24, 2005 WL 1309910, at *3 (M.D. Fla. May 31, 2005) (judicial notice taken of inmate handbook and grievance procedures stated therein).

*Id.*

It is impossible for Chandler to have exhausted his allegations arising after the filing of this case. Thus, his claims regarding improper after-care following his second, August 31, 2015, tonsillectomy as well as the July 21, 2016, incident in which he alleges he was forced to carry seventy-five pounds, will be dismissed without prejudice for failure to exhaust administrative remedies.[10]

### D. Sovereign Immunity

Chandler has sued all defendants in both their official and individual capacities. Doc. #24 at 24. The Eleventh Amendment protects a state's sovereign immunity from suit and liability on both federal and state causes of action in any federal court. *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 252–53 (5th Cir. 2005). An assertion of Eleventh Amendment immunity must be addressed before the merits of a complaint. *United States v. Tex. Tech Univ.*, 171 F.3d 279, 286 (5th Cir. 1999). However, whether a "particular statutory cause of action … itself permits,"[11] the action to be asserted against a state should be considered before "inquiring into any Eleventh Amendment immunity."[12]

"[A] State is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State*

---

[10] Though an earlier grievance regarding an ongoing policy or practice may obviate the need for filing later grievances as to the same issue, that is not the situation in the present case. Where a § 1983 plaintiff's complaint addresses an ongoing problem or multiple instances of the same type of harm—arising out of a prison policy—he need not file a new grievance in each new instance to qualify for exhaustion. "Where the original grievance complains of a general prison policy, changed circumstances will not necessarily necessitate re-exhaustion." *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 788 (5th Cir. 2012), *as corrected* (Feb. 20, 2013). In his complaint, Chandler has not claimed that an MDOC policy gave rise to the denial of medical care he has alleged. In addition, Chandler's non-medical care claims clearly arose after the filing of his complaint.

[11] *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 779 (2000).

[12] *United States ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398, 402 n.3 (5th Cir. 2004) (citing *Stevens*, 529 U.S. at 779–80).

*Police*, 491 U.S. 58, 64 (1989).   This holding also applies to any "governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes."   *Id.* at 70.   The State, arms of the State, and state officials sued in their official capacity are not "persons" within the meaning of § 1983.   *Id.* at 70–71.   Accordingly, MDOC, and its officials Fisher, Lee, Williams, and Perry—in their official capacities—are entitled to dismissal.

### E.  Denial of Adequate Medical Care

As discussed above, Chandler's claims of denial of adequate medical care occurring in 2010 and 2011 outside the statute of limitations—or after the filing of this case in 2015—cannot be considered under § 1983.   However, even if the Court considered all of Chandler's medical care allegations—from 2009 (the year of the first entry in his medical record regarding his complaints) to present—his allegations fail to state a claim upon which relief could be granted.

#### *1.  Deliberate Indifference Standard*

Chandler claims the defendants denied him adequate medical care and treatment for his back, chest, foot, and hip pain, as well as the repeated infections of his right tonsil.   To prevail on an Eighth Amendment claim for denial of medical care, Chandler must allege facts which demonstrate "deliberate indifference to [his] serious medical needs [that] constitutes the unnecessary and wanton infliction of pain … whether the indifference is manifested by prison doctors … or by prison guards in intentionally denying or delaying access to medical care …." *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976) (quotation marks omitted); *see Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992) (inadequate medical care claim requires proof of "deliberate indifference to serious medical needs").   The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law."   *Farmer v. Brennan*, 511 U.S. 825, 839

(1994).  Under this standard, a state actor may not be held liable under § 1983 unless a plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference."  *Id*. at 837.  Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness.  *Id*. at 842–43.  Negligent conduct by prison officials does not rise to the level of a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 328–29 (1986).

In cases, such as this, which allege delayed medical attention rather than its outright denial, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay to state a claim for a civil rights violation.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for deliberate indifference to serious medical needs.  *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001).

"Deliberate indifference is not established when medical records indicate that the plaintiff was afforded extensive medical care by prison officials."  *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quotation marks and alterations omitted).  Nor is it established when a physician does not accommodate either a prisoner's requests or a prisoner's disagreement with the treatment. *Id*.; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007).  To meet his burden in establishing deliberate indifference on the part of medical staff, Chandler "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."

*Brauner*, 793 F.3d at 498.

### 2. Application to Facts

The Court has reviewed the extensive, nearly 700-page record of Chandler's medical treatments for his various conditions and summarized those pertaining to the issues in this case in chronological order by type of ailment. *See* Ex. A. The summary includes all treatment Chandler received in the years before and after his filing of this case to provide a complete picture of the level of treatment. While Chandler was treated for conditions other than those at issue here, they are not reflected in the summary as his claims do not involve them.

Chandler was treated one hundred and six times for SI Joint Dysfunction, five times for plantar fasciitis (which medical personnel came to believe was related to his SI Joint Dysfunction), one hundred and fifteen times for tonsil ailments (including two surgeries to remove his tonsils), seventeen times for costochondritis, and five times for shoulder pain (which doctors believed could be related to costochondritis). *See generally id.* Thus, Chandler was examined or treated two hundred and forty-eight times from 2009 to 2018—twenty-eight times per year on average—for the conditions relevant to his complaint.

Early in the treatment of his various maladies, Chandler requested more aggressive treatment and referral to a specialist. *Id.* at 2. However, in most cases, medical personnel chose to initially provide more conservative treatment, moving toward more aggressive treatment when the conservative treatment failed to provide satisfactory results.[13] Medical providers also prescribed medications—nonsteroidal anti-inflammatory drugs ("NSAIDs"), injections, and various cough

---

[13] For example, as to Chandler's tonsil trouble, medical personnel first prescribed a special mouthwash and gargling with warm salty water; later, they prescribed antibiotics, and then changed to a different antibiotic when the previous one did not work. Ex. A at 3.

and cold medications—to relieve the painful symptoms of Chandler's recurring tonsil infections. *Id*. at 1. They further conducted diagnostic testing, such as analyzing cultures of his tonsil drainage. *Id*. at 3. When his sinus symptoms persisted, despite the escalating treatments, medical personnel referred Chandler to an off-site ear, nose, and throat surgeon ("ENT"), and his tonsils were removed in 2011. *Id*.

Eventually, Chandler's tonsil trouble returned, and medical personnel followed the same escalating protocol as before, culminating in a second tonsillectomy in 2015 which removed a "tonsil stump." *Id*. at 4. Chandler's throat problems recurred, even after the second surgery, and the providers then conducted diagnostic testing, provided Chandler instructions on oral hygiene, and prescribed him NSAIDs and antibiotics. *Id*. When those treatments did not provide relief, he was again referred to an off-site ENT and, according to his statement to medical personnel, on January 10, 2018, was recommended for a third tonsil surgery. *Id*. On the latest entry in his medical records regarding his tonsils entered on March 9, 2018, Chandler was directed to continue his medication. *Id*.

Chandler complains about the treatment he received after his tonsil surgery on February 23, 2011—specifically, he alleges MDOC personnel failed to provide him with a special diet and cool environment, which he believes led to an infection at the surgery site. *Id.* at 3; Doc. #24 at 7. Medical records show that Chandler suffered bleeding and an infection in early March of 2011, less than two weeks after surgery, and medical personnel prescribed Chandler antibiotics. Ex. A at 3. Chandler's next examination regarding tonsil trouble occurred over two years later on September 27, 2013. *Id*.

Chandler also claims that in 2015, he developed a bacterial infection in his right tonsil and

the defendants delayed treating the condition for five months. Doc. #24 at 11. However, Chandler's medical records show that he was examined and treated multiple times between March 31, 2015, and his surgery on August 28, 2015. Ex. A at 3–4. On March 31, 2015, medical personnel prescribed gargling with warm salt water and medication. *Id*. at 3. Medical personnel also educated Chandler on how to manage his tonsil condition. *Id*. Chandler then visited the doctor two weeks later, who referred him to an ENT. *Id*. Chandler returned to the clinic on April 24, 2015, and his tonsil appeared normal. *Id*. at 4. On May 11, 2015, Chandler returned to the prison clinic for a follow-up examination. *Id*. He did not show up for his next appointment on June 24, 2015. *Id*. During an examination on June 29, 2015, medical personnel noted a swollen lymph node and referred Chandler to a surgeon. *Id*. Chandler visited the surgeon on August 18, 2015, and the surgeon examined him and determined surgery would be appropriate. *Id*. Chandler was transported to the hospital on August 27, 2015, where doctors performed a pre-surgery examination and the next day, he underwent surgery to remove the remnants of his right tonsil. *Id*.

The same pattern—medical personnel escalating treatment with the worsening of Chandler's symptoms—also holds true for his complaints regarding SI Joint Dysfunction. It took time for medical providers to determine the cause of Chandler's back, hip, and foot pain, as it was initially diagnosed separately as sciatica[14] and plantar fasciitis. *Id*. at 1–2. Chandler's medical providers subsequently determined that it was likely that all or most of his symptoms related to his back, hip, and foot arose from SI Joint Dysfunction and bone spurs, and he was treated for those

---

[14] Sciatica is "[p]ain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction … but now known to usually be due to herniated lumbar disk compressing a nerve root …." STEDMAN'S MEDICAL DICTIONARY 801240 (2014).

conditions.  *Id.* at 1–2.  During treatment for his SI Joint Dysfunction symptoms, medical personnel provided Chandler with diagnostic testing (including x-rays and magnetic resonance imaging), NSAIDS, injections, physical therapy, a cane, an SI belt, and other treatments.  *Id.* at 1–2.  Medical providers also gave Chandler instructions regarding proper posture and exercises to relieve symptoms.  *Id.*  These treatments provided Chandler partial—but not complete—relief.

Chandler also contends that medical personnel misdiagnosed his chest pain as a symptom of costochondritis.  *See* Doc. #58-4 at 50.  When Chandler experienced chest pain, he wanted to ensure that the symptoms were, in fact, costochondritis—and not heart disease.  *See id.* at 45.  Medical personnel provided Chandler with antibiotics (when it seemed the chest pain was due to a cough), ibuprofen, Indomethacin,[15] acetaminophen, injections, prednisone,[16] Ketorolac,[17] and Mobic.  Ex. A at 4.  These treatments appear to have worked for a time but the pain returned, and medical personnel reassured Chandler that his chest pains were not due to heart disease.  Doc. #58-4 at 45; *see* Ex. A at 4.  Chandler is, nevertheless, skeptical of the diagnosis.

Chandler's shoulder pain was diagnosed as Tenosynovitis,[18] although some providers believed it was related to costochondritis.  Ex. A at 5; Doc. #58-2 at 95.  For his shoulder pain, medical providers followed a course of treatment like that for costochondritis—NSAIDs and pain medication.  Ex. A. at 5.

---

[15] Indomethacin is a "potent analgesic, antipyretic, and nonsteroidal antiinflammatory agent used to treat acute exacerbations of various joint diseases. It is also used to produce closure of a patent ductus arteriosus in infants."  *Id.* at 442720.

[16] Prednisone is a "dehydrogenated analogue of cortisone with the same actions and uses; must be converted to prednisolone before active; inhibits proliferation of lymphocytes."  *Id.* at 717600.

[17] Ketorolac is an NSAID.  *Id.* at 267230.

[18] Tenosynovitis is defined as the "[i]nflammation of a tendon and its enveloping sheath."  *Id.* at 902170.

Over his nine years of incarceration with the MDOC, Chandler has been treated by medical personnel on hundreds of occasions. In addition to providing Chandler with a great deal of medical treatment for his ailments, prison medical personnel have ordered two surgeries to remove his tonsils.

"Deliberate indifference is not established when medical records indicate that [the prisoner] was afforded extensive medical care by prison officials." *Brauner*, 793 F.3d at 500 (quotation marks omitted). By any measure, Chandler was afforded extensive medical care by prison officials. Chandler's desire for more aggressive medical treatments to be administered sooner is merely a claim that physicians did not accommodate his requests in the manner he desired—which does not rise to the level of a constitutional violation. *Id.*; *Miller*, 253 F. App'x at 401. Based on the summary judgment record, Chandler has not shown that medical staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498. Rather, the summary judgment record reflects that Chandler was provided with escalating care for his conditions—including surgery for his tonsils—until his complaints were resolved. Accordingly, Chandler's denial of adequate medical assistance claim is without merit and will be dismissed.

## IV
## Conclusion

The defendants' motion for summary judgment [45] is **GRANTED**. Accordingly:

1. Chandler's allegations for failure to adequately respond to grievances and denial of adequate medical care are **DISMISSED** for failure to state a claim upon which relief can be granted;

2.      MDOC, Marshall Fisher, Earnest Lee, Jerry Williams, and Gloria Perry, in their official capacities, are **DISMISSED with prejudice**;

3.      Chandler's claims regarding events occurring before August 11, 2012, are **DISMISSED with prejudice** as barred by the applicable statute of limitations; and

4.      Chandler's allegations regarding events occurring after the filing of this case (including the stomping of his hand and the forced carrying of a heavy load) are **DISMISSED** for failure to exhaust administrative remedies.

**SO ORDERED**, this 28th day of September, 2018.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**

**Joey Montrell Chandler, 4:15-CV-102**

**Medical Treatment Relevant to Complaint (Excluding Routine Treatment or Treatment for Other Conditions)**

**Number of Times Treated:**

| | | |
|---|---|---|
| SI Joint Dysfunction: | | 106 |
| Plantar fasciitis (later determined to be SI Joint Dysfunction): | | 5 |
| Tonsils: | | 115 |
| Costochondritis: | | 17 |
| Shoulder pain (later found to be Costochondritis: | | 5 |
| Total number of times treated (all relevant medical issues): | | 248 (roughly 28 times per year) |

**Relevant Medical Treatment**

**SI Joint (Back, foot, hip pain)**

| Date of Treatment | Reference | Type of Visit | Treatment, comments |
|---|---|---|---|
| 9/13/2010 | 58-2 at 1 | Exam | Apply warm compress to hip |
| 11/7/2010 | 58-3 at 109 | Exam | MD notified; cool compresses, moist heat, avoid sports, then strength exercises |
| 12/3/2010 | 58-2 at 52 | Exam | Order spine x-ray; no lifting |
| 12/9/2010 | 58-6 at 46 | X-ray results | Minor degenerative disc disease, L5-S1; no regional bony fracture or dislocation |
| 7/12/2011 | 58-3 at 101 | Exam | Refer to MD; meds per protocol, IBU |
| 7/15/2011 | 58-2 at 72 | Exam | Left back/foot pain:  Foot X-ray |
| 8/12/2011 | 58-2 at 70 | Follow-up | X-ray findings, foot and back painNaproxen |
| 8/23/2011 | 58-3 at 99 | Exam | Refer to MD; arch painful, x-ray normal, meds do not work |
| 8/26/2011 | 58-2 at 68 | Exam | Back pain: Crutches, heat, prednisone, lower bunk profile, no weight bearing, injection, f'u 2 weeks |
| 9/2/2011 | 58-3 at 97 | Exam | Showed pt how to adjust crutches |
| 9/6/2011 | 58-3 at 66 | Exam | Showed pt how to adjust crutches |
| 9/20/2011 | 58-2 at 66 | Exam | Left back/foot pain:  IBU |
| 9/22/2011 | 58-6 at 40 | Exam | Refused treatment |
| 2/17/2012 | 58-3 at 91 | Exam | IBU, refer to MD |
| 2/21/2012 | 58-2 at 63 | Exam | IBU |
| 4/12/2012 | 58-2 at 110 | Follow-up | Prescribed Medrol, APAP, alternate APAP and NSAIDS |
| 7/3/2012 | 58-2 at 108 | Exam | Refill of APAP |
| 7/18/2012 | 58-2 at 106 | Follow-up | Lower bunk profile, IBU, education |
| 1/30/2013 | 58-4 at 10 | Exam | Meds given per protocol, f'u scheduled |
| 4/15/2013 | 58-2 at 101 | Follow-up | IBU |
| 4/15/2013 | 58-6 at 80 | Exam | Continue taking IBU -- with food |
| 4/29/2013 | 58-4 at 14 | Exam | Change meds, IBU to APAP, teach proper back mechanics |
| 6/7/2013 | 58-4 at 8 | Exam | APAP given; continue current medication regimen |
| 6/11/2013 | 58-2 at 100 | Follow-up | Diagnosis: Sciatica |
| 8/2/2013 | 58-1 at 66 | Return from Spinal MRI | No progress of disease |
| 8/2/2013 | 58-6 at 52 | MRI results:  Spine | Unremarkable noncontrast lumbar spine MRI |
| 8/10/2013 | 58-4 at 4 | Exam | IBU given, patient assured, appt pending with MD |
| 8/15/2013 | 58-4 at 6 | Exam | Referred to MD, pain meds offered but refused, scheduled MRI |
| 9/5/2013 | 58-2 at 12 | Follow-up | Results from MRI, APAP Tabs, |
| 9/13/2013 | 58-3 at 21 | Physical therapy (PT) | |
| 9/17/2013 | 58-5 at 84 | Exam | Received walking cane |
| 10/17/2013 | 58-2 at 2 | Exam | Refer to provider; meds per protocol, pt educated |
| 4/11/2014 | 58-4 at 24 | Exam | Refer to provider |
| 4/18/2014 | 58-2 at 10 | Exam | Analgesics, labs |
| 6/18/2014 | 58-2 at 48 | Follow-up | |
| 6/19/2014 | 58-1 at 44 | Exam | Referral to PT |
| 9/30/2014 | 58-1 at 2 | Exam | |
| 9/30/2014 | 58-2 at 81 | Exam | Sciatic nerve pain:  SI joint x-ray (rule out sacroilitis, other pathology) |
| 10/1/2014 | 58-2 at 44 | Follow-up | SI joint pain:  PT, advised to walk w/o cane |
| 10/1/2014 | 58-5 at 91 | Exam | Received Meloxicam |
| 10/2/2014 | 58-6 at 48 | X-ray results:  SI joint | SI joints within normal limits |
| 10/7/2014 | 58-1 at 3 | Exam | Appt scheduled |
| 10/9/2014 | 58-1 at 43 | Exam | Wants PT |
| 10/9/2014 | 58-2 at 43 | Follow-up | SI joint pain:  Walking w/o cane, but pain moved to left side, send to PT |
| 10/22/2014 | 58-3 at 20 | Physical therapy (PT) | |
| 11/5/2014 | 58-3 at 18 | Physical therapy (PT) | |
| 11/10/2014 | 58-3 at 17 | Physical therapy (PT) | |
| 11/17/2014 | 58-1 at 42 | Physical therapy (PT) | |

| | | | |
|---|---|---|---|
| 11/17/2014 | 58-2 at 79 | Exam | Right hip pain:  Mobic |
| 11/17/2014 | 58-3 at 15 | Physical therapy (PT) | |
| 11/17/2014 | 58-5 at 89 | Exam | Received bottom bunk profile |
| 11/19/2014 | 58-6 at 3 | Exam | Received Meloxicam |
| 12/1/2014 | 58-3 at 13 | Physical therapy (PT) | |
| 12/8/2014 | 58-3 at 11 | Physical therapy (PT) | |
| 12/17/2014 | 58-1 at 5 | Appt scheduled | |
| 12/17/2014 | 58-4 at 19 | Exam | Follow-up with MD pending |
| 12/18/2014 | 58-2 at 41 | Follow-up | Hip and foot pain:  Insisted on CT scan; left office when request was denied. |
| | | | Dr. will examine when pt returns. |
| 2/20/2015 | 58-4 at 43 | Exam | Refer to MD |
| 3/9/2015 | 58-6 at 6 | Exam | Received Prednisone, IBU (keep on person) |
| 5/4/2015 | 58-1 at 11 | Follow-up | |
| 5/4/2015 | 58-4 at 38 | Exam | Pt education, refer to MD, avoid sports |
| 5/5/2015 | 58-3 at 123 | Exam | Prescribe Prednisone, Mobic; previously tried PT |
| 5/6/2015 | 58-6 at 7 | Exam | Received Prednisone, Mobic (keep on person) |
| 5/14/2015 | 58-2 at 125 | Exam | Inform pt to finish prednisone pack (on day 5 of 12) |
| 7/14/2015 | 58-6 at 8 | Exam | Received Meloxicam (keep on person) |
| 7/29/2015 | 58-1 at 15 | Follow-up | |
| 7/29/2015 | 58-4 at 34 | Exam | Follow-up with MD |
| 8/13/2015 | 58-2 at 122 | Exam | Prescribed Mobic |
| 10/15/2015 | 58-1 at 16 | Follow-up | |
| 10/15/2015 | 58-4 at 30 | Exam | Cold compress, elevate leg, Acetaminophen, Ibuprofen, crutches, lay-in, refer to MD |
| 3/17/2016 | 58-4 at 67 | Exam | Refer to provider for f/u |
| 3/18/2016 | 58-2 at 120 | Exam | Prescribed rubber tennis shoes; no indication for bottom bunk |
| 6/8/2016 | 58-4 at 65 | Exam | Checking on shoes |
| 6/10/2016 | 58-2 at 118 | Exam | Renew bottom bunk profile |
| 6/12/2016 | 58-6 at 58 | Exam | Ordered orthopedic shoes |
| 8/14/2016 | 58-1 at 23 | Exam | |
| 8/14/2016 | 58-4 at 56 | Exam | Requests MRI, ortho shoes, meds ineffective.  Referral to MD for MRI and shoe request |
| 9/7/2016 | 58-1 at 24 | Exam | Wants orthopedic shoes |
| 9/7/2016 | 58-1 at 40 | Exam | Refer to PT for ortho shoes |
| 9/7/2016 | 58-4 at 54 | Exam | Request orthopedic shoes; referred to PT for shoes |
| 9/13/2016 | 58-3 at 10 | No show | Reschedule due to transporation problem |
| 9/17/2016 | 58-1 at 25 | Exam | Wants orthopedic shoes, treatment by specialist, referral to specialist |
| 9/17/2016 | 58-4 at 52 | Exam | Pt says Tylenol not working; refer to provider; return to clinic with any complications |
| 9/20/2016 | 58-3 at 8 | Physical therapy (PT) | |
| 9/27/2016 | 58-3 at 7 | Physical therapy (PT) | |
| 10/4/2016 | 58-3 at 33 | Physical therapy (PT) | |
| 10/5/2016 | 58-2 at 32 | Follow-up:  back pain and shoes | DM shoes not indicated |
| 10/11/2016 | 58-3 at 32 | Physical therapy (PT) | |
| 10/11/2016 | 58-6 at 14 | Exam | Received orthopedic shoes |
| 10/12/2016 | 58-6 at 87 | Exam | Pt received orthopedic shoes |
| 10/18/2016 | 58-3 at 30 | Physical therapy (PT) | |
| 10/25/2016 | 58-3 at 29 | Physical therapy (PT) | No-show, transporation problem |
| 11/8/2016 | 58-3 at 27 | Physical therapy (PT) | |
| 11/15/2016 | 58-3 at 25 | Physical therapy (PT) | |
| 1/11/2017 | 58-6 at 17 | Exam | Received SI belt |
| 1/12/2017 | 58-3 at 23 | Physical therapy (PT) | |
| 3/30/2017 | 58-4 at 47 | Exam | Renew bottom rack; appt scheduled with provider |
| 3/31/2017 | 58-2 at 112 | Exam | First diagnosis of SI dysfunction; prescribe Acetaminophen |
| 3/31/2017 | 58-6 at 18 | Exam | Received bottom bunk profile |
| 7/12/2017 | 58-6 at 77 | Exam | Educate pt regarding disease process; lifestyle modification |
| 11/21/2017 | 58-1 at 29 | Exam, referral | Wants orthopedic shoes |
| 11/21/2017 | 58-1 at 35 | Exam | Refer to PT for ortho shoes.  Dr.:  "Shoes are supposed to last three years." |
| 11/21/2017 | 58-1 at 57 | Exam | Received orthopedic shoes |
| 11/21/2017 | 58-6 at 57 | Exam | Ordered orthopedic shoes |
| 11/29/2017 | 58-1 at 82 | Receipt of orthopedic shoes | |
| 11/29/2017 | 58-6 at 19 | Exam | Received diabetic shoes, 1 year |
| 3/9/2018 | 58-1 at 31 | Exam | Received bottom bunk profile |

**Plantar fasciitis (foot pain) -- later determined to be related to SI Joint Dysfunction**

| | | | |
|---|---|---|---|
| 11/15/2011 | 58-3 at 95 | Exam | Refer to MD |
| 11/23/2011 | 58-1 at 83 | Exam | Medication applied |
| 2/19/2015 | 58-1 at 6 | Exam | |
| 3/5/2015 | 58-3 at 4 | Exam | Prednisone, IBU, 1 year bottom bunk profile, review nutrition, exercise, medication |
| 3/6/2015 | 58-1 at 7 | Exam | |

**Tonsils**

| | | | |
|---|---|---|---|
| 4/21/2009 | 58-3 at 36 | Exam | Prescribed Miracle Mouthwash |
| 8/5/2009 | 58-3 at 40 | Exam | Prescribed Guaifenesin, Mycostatin |
| 8/14/2009 | 58-3 at 38 | Exam | Prescribed Erythromycin, Miracle Mouthwash |

| Date | Provider | Type | Notes |
|---|---|---|---|
| 3/3/2010 | 58-3 at 83 | Exam | Forward Sick Call Request to MD for eval and medication |
| 3/3/2010 | 58-4 at 76 | Exam | Rocephin injection |
| 3/10/2010 | 58-3 at 79 | Exam | OTC medication given, return to clinic for MD evaluation |
| 3/17/2010 | 58-2 at 58 | Exam | Penicillin |
| 3/17/2010 | 58-3 at 81 | Exam | Referral to MD |
| 4/10/2010 | 58-3 at 62 | Exam | OTC medication, spec. consult pending; gave Chlorpheniramine Maleate for congestion |
| 4/12/2010 | 58-2 at 7 | Exam | Refer to ENT: Prior treatments ineffective |
| 4/22/2010 | 58-6 at 28 | Exam | Blood drawn for lab work |
| 5/5/2010 | 58-2 at 6 | Exam | ENT consult: Throat culture |
| 5/13/2010 | 58-2 at 5 | Follow-up | Enlarged tonsils: Salt water gargles after food |
| 7/23/2010 | 58-3 at 75 | Exam | Referral to MD, appt scheduled |
| 7/28/2010 | 58-2 at 56 | Exam | Keflex |
| 8/11/2010 | 58-3 at 73 | Exam | Doctor evaluation, appt scheduled |
| 8/13/2010 | 58-2 at 54 | Exam | Solu-Medrol, 1 dose; prednisone |
| 9/7/2010 | 58-3 at 71 | Exam | Referral to provider, antibiotic did not work |
| 9/9/2010 | 58-6 at 27 | Exam | Received Bicillen injection |
| 9/10/2010 | 58-3 at 68 | Exam | Bicillin injection |
| 9/12/2010 | 58-6 at 26 | Exam | Received Bicillen injection |
| 9/13/2010 | 58-2 at 1 | Follow-up after 5 days bicillin injections | Tonsil infection |
| 9/13/2010 | 58-6 at 25 | Exam | Received Bicillen injection |
| 9/24/2010 | 58-3 at 69 | Exam | Referral to provider |
| 9/29/2010 | 58-1 at 88 | Follow-up after antibiotics | No acute infection, no swelling |
| 10/5/2010 | 58-3 at 115 | Exam | Refer to provider; Chlorpheniramine maleate, Guaifenesin |
| 10/6/2010 | 58-3 at 111 | Exam | Meds (APAP) given. Did not receive mouthwash; tonsils sore; lymph node swelling; mild tonsil swelling |
| 10/12/2010 | 58-5 at 74 | Exam | Pt refused treatment |
| 10/12/2010 | 58-6 at 22 | Exam | Pt referred to MD for treatment |
| 10/15/2010 | 58-3 at 113 | Exam | Schedule provider eval |
| 10/19/2010 | 58-2 at 28 | Exam | Tonsils enlarged, wants tonsils removed |
| 10/26/2010 | 58-6 at 73 | Exam | Prescribed Cepacol lozenges |
| 11/2/2010 | 58-2 at 26 | Exam | IBU prescribed, numerous courses of PCN, Keflex, amoxicillin failed. Culture taken |
| 11/5/2010 | 58-3 at 44 | Exam | Prescribed Ciprofoxacin |
| 11/16/2010 | 58-2 at 24 | Exam | Infection noted, prescribed Cipro |
| 12/10/2010 | 58-2 at 21 | Exam | Cepacol lozenges |
| 12/15/2010 | 58-2 at 20 | Follow-up re: sore throat | Left doctor, refused advice. No active infection. |
| 12/17/2010 | 58-1 at 45 | Exam, referal to OMC | |
| 12/28/2010 | 58-2 at 19 | Follow-up re: tonsils bleeding | Awaiting ENT appt date |
| 1/27/2011 | 58-1 at 63 | Keflex, lortab off-site Dr. Visit | MD would like to remove tonsils |
| 1/27/2011 | 58-6 at 69 | Exam | Diagnosis of chronic adenotonsillitis; surgery recommended |
| 2/7/2011 | 58-3 at 105 | Exam | IBU, ctm; refer to MD; return to clinic if needed |
| 2/22/2011 | 58-6 at 20 | Pre-surgery Exam | Do not eat or drink anything after midnight |
| 2/23/2011 | 58-3 at 43 | Exam | Prescribed Keflex, Lortab, Liquid diet, move to CMCF Infirmary overnight |
| 2/23/2011 | 58-6 at 45 | Post-surgery observation | Throat pain; given Lortab |
| 2/23/2011 | 58-6 at 50 | Discharge summary: tonsillectomy | |
| 2/23/2011 | 58-6 at 74 | Exam | Prescribed Keflex, Lortab |
| 2/24/2011 | 58-3 at 42 | Exam | Prescribed Keflex, Lortab |
| 2/24/2011 | 58-5 at 77 | Exam | Full liquid diet |
| 2/25/2011 | 58-6 at 44 | Post-surgery observation | Resting quietly |
| 3/2/2011 | 58-3 at 59 | Exam | Prescribed warm water salt gargle, 2 weeks of soft diet |
| 3/2/2011 | 58-3 at 103 | Post-surgery exam | Spitting up blood; refer to MD |
| 3/2/2011 | 58-5 at 78 | Exam | Chewing problems diet, 2 weeks |
| 3/8/2011 | 58-2 at 17 | Follow-up | Tonsils removed: Infection noted; Prescribed Z-pack |
| 9/27/2013 | 58-4 at 69 | Exam | Toradol injection |
| 12/9/2013 | 58-4 at 87 | Exam | Toradol, Decadron injection |
| 1/31/2014 | 58-3 at 54 | Exam | Replaced Indomethacin with Tylenol E.S. |
| 6/18/2014 | 58-6 at 81 | Exam | Pt complained re: thryroid problem, stated x-rays were taken; none exist; malingering, mental disorder? |
| 9/30/2014 | 58-6 at 82 | Exam | Follow-up with Dr. Levine |
| 3/24/2015 | 58-1 at 8 | No show | Rescheduled, lockdown |
| 3/24/2015 | 58-4 at 42 | Exam | |
| 3/31/2015 | 58-1 at 9 | Exam | |
| 3/31/2015 | 58-2 at 40 | Follow-up | Instructed to gargle as needed |
| 3/31/2015 | 58-4 at 40 | Exam | Warm salt gargle, medication, patient education |
| 4/14/2015 | 58-1 at 10 | Exam | |
| 4/14/2015 | 58-4 at 92 | Exam | Pt wants referral to ENT; refer to MD |
| 4/15/2015 | 58-1 at 41 | Exam | Request ENT treatment |
| 4/15/2015 | 58-2 at 39 | Exam | Referral to ENT |
| 4/24/2015 | 58-3 at 3 | Exam | Tonsils look normal |
| 5/11/2015 | 58-1 at 12 | Follow-up | |
| 5/11/2015 | 58-4 at 36 | Exam | GI disruption from tonsils: Follow-up as needed |
| 6/24/2015 | 58-1 at 13 | No show | |
| 6/29/2015 | 58-1 at 14 | Exam | Lymph node swollen |
| 6/29/2015 | 58-2 at 124 | Exam | Refer to surgeon for consult |
| 8/18/2015 | 58-1 at 68 | Return from off-site visit | MD would like to remove "tonsil stumps" |
| 8/18/2015 | 58-6 at 70 | Pre-surgery exam | Free world provider |
| 8/27/2015 | 58-3 at 53 | Pre-surgery | NPO (nothing by mouth) after midnight |

| | | | |
|---|---|---|---|
| 8/28/2015 | 58-1 at 69 | Post-op discharge papers | |
| 8/28/2015 | 58-1 at 73 | Exam, return from off-site visit | No complaints |
| 8/28/2015 | 58-3 at 35 | Pathology | Tissue from oral surgery |
| 8/28/2015 | 58-3 at 52 | Post-surgery treatment | Prescribed Tylenol/Codeine |
| 8/28/2015 | 58-3 at 60 | Surgery | Removal of right tonsil |
| 8/28/2015 | 58-6 at 49 | Outpatient surgery orders | |
| 8/28/2015 | 58-6 at 51 | Surgical instruction sheet | |
| 9/8/2015 | 58-2 at 37 | Post-op follow-up:  tonsils swelling, bleeding | Occasional bleeding, no swelling |
| 9/15/2015 | 58-1 at 75 | Exam, return from off-site visit | No complaints |
| 10/8/2015 | 58-4 at 32 | Exam | Refer to provider; f/u as needed |
| 10/15/2015 | 58-1 at 16 | Follow-up | |
| 10/16/2015 | 58-3 at 51 | Exam | Mild oral thrush; prescr Diflucan, Amox; ordered CBC, C-reactive protein test, Urinalysis |
| 10/17/2015 | 58-2 at 121 | Follow-up | Prescribed Amoxicillin, Diflucan, discussed oral hygiene |
| 2/22/2016 | 58-4 at 28 | Exam | Acetaminophen; return to clinic if symptoms continue |
| 2/24/2016 | 58-1 at 18 | Exam | |
| 2/26/2016 | 58-3 at 50 | Exam | Ordered lab test of right tonsil drainage |
| 2/26/2016 | 58-4 at 26 | Exam | Throat culture; antibiotic therapy; refer to provider for results; return to clinic as needed |
| 3/5/2016 | 58-6 at 86 | Exam | Follow-up with provider re:  lab results |
| 3/22/2016 | 58-1 at 17 | No show | School |
| 4/8/2016 | 58-6 at 10 | Exam | Refused treatment (medication cleared up mouth drainage) |
| 4/8/2016 | 58-6 at 30 | Exam | Refused treatment |
| 4/18/2016 | 58-1 at 19 | Refused appointment | |
| 6/8/2016 | 58-1 at 20 | Follow-up | |
| 6/8/2016 | 58-4 at 65 | Exam | |
| 7/7/2016 | 58-1 at 21 | Exam | |
| 7/7/2016 | 58-2 at 34 | Follow-up | Z-pack |
| 7/7/2016 | 58-4 at 63 | Exam | Patient instructed per nursing protocol; referral to provider |
| 7/22/2016 | 58-1 at 22 | Exam | |
| 7/22/2016 | 58-4 at 61 | Exam | Return to clinic with any complications |
| 8/14/2016 | 58-1 at 23 | Exam | |
| 8/17/2016 | 58-2 at 116 | Exam | Prescribed Tylenol |
| 12/1/2016 | 58-2 at 115 | No-show | Rescheduled, transportation issue |
| 2/3/2017 | 58-4 at 48 | Exam | Refer to MD, insufficient light to see tonsil |
| 2/9/2017 | 58-2 at 114 | Exam | Wants ENT consult; tonsillectomy 2011 and 2015; refer to ENT |
| 3/9/2017 | 58-1 at 61 | Exam | Taught medication usage, comfort measures |
| 10/2/2017 | 58-1 at 52 | Exam | Wants update on ENT appt |
| 11/21/2017 | 58-1 at 29 | Exam | Refer to MD |
| 1/10/2018 | 58-1 at 33 | Exam | Check on surgery date |
| 3/9/2018 | 58-1 at 31 | Exam | Continue meds |

## Costochondritis (Chest, shoulder pain)

| | | | |
|---|---|---|---|
| 3/29/2012 | 58-2 at 61 | Exam | Chest pain:  Amoxicillin (for cough) |
| 4/11/2012 | 58-3 at 89 | Exam | IBU, refer to MD |
| 8/17/2012 | 58-2 at 104 | Exam | Chest pain:  IBU, Indomethacin |
| 9/27/2013 | 58-3 at 64 | Exam | Chest pain:  Notified Dr. |
| 10/17/2013 | 58-4 at 2 | Exam | Pt educated; refer to provider; meds per protocol; Acetaminophen |
| 11/8/2013 | 58-3 at 123 | Exam | Pt reassured; refer to MD; continue current medication |
| 12/4/2013 | 58-3 at 121 | Exam | Pt educated; refer to provider |
| 12/27/2013 | 58-4 at 94 | Exam | Prescribed Indocin |
| 2/24/2014 | 58-3 at 117 | Exam | Pt reassured; refer to MD |
| 2/27/2014 | 58-2 at 90 | Exam | Chest pain: Solu-Medrol injection |
| 4/11/2014 | 58-4 at 24 | Exam | Refer to provider |
| 4/18/2014 | 58-2 at 10 | Exam | No objective signs of costochondritis |
| 11/24/2016 | 58-1 at 26 | Follow-up | Burning, pain; diagnosed as costochondritis |
| 11/24/2016 | 58-4 at 50 | Exam | Refer to MD; Pt does not believe costochondritis diagnosis |
| 12/5/2016 | 58-2 at 49 | Follow-up | |
| 4/23/2017 | 58-1 at 84-87 | Exam | Chest pain, left arm numbness, prescr prednisone, Ketorolac |
| 4/26/2017 | 58-1 at 47 | Exam | Chest pain, left arm pain |
| 5/26/2017 | 58-4 at 45 | Exam | Pt reassured, refer to provider |

## Shoulder Pain (Suspected Costochondritis)

| | | | |
|---|---|---|---|
| 10/21/2013 | 58-2 at 98 | Follow-up | Diagnosis:  Tenosynovitis; gave injection; changed medication to APAP |
| 11/21/2013 | 58-2 at 97 | Follow-up | Changed medication to naproxen |
| 12/9/2013 | 58-2 at 96 | Follow-up | Changed medication from IBU to Mobic |
| 12/23/2013 | 58-2 at 94 | Follow-up | Changed medication from IBU and Mobic to Indocin |
| 12/24/2013 | 58-3 at 119 | Exam | Refer to MD; continue current pain meds |